AO 106 (Rev. 06/09)  Application for a Search Warrant

**FILED**
8/2/2017
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| A brick house with green shutters and a brown awning located at 511 E Booneslick Rd, Warrenton, Missouri 63383 | )   Case No.   4:17 MJ 5187 NAB |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, <u>Teresa Dailey</u>, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

A brick house with green shutters and a brown awning located at 511 E Booneslick Rd, Warrenton, Missouri, as shown in attachement A

located in the _____EASTERN_____ District of _____MISSOURI_____ , there is now concealed

see attachment B and C

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1035, 1347, 21 U.S.C. 841(a) (1) | Making False Statements to a Health Care Benefits Program, Health Care Fraud, distributing controlled substances |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*
Teresa Dailey, Special Agent, HHS-OIG

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____August 2, 2017_____

_____
*Judge's signature*

City and state: _____St. Louis, MO_____

Honorable Nannette A. Baker, U.S. Magistrate Judge
*Printed name and title*

AUSA:   Andrew J. Lay

**FILED**
8/2/2017
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

**AFFIDAVIT FOR SEARCH WARRANT**

I, Teresa A. Dailey, ("Affiant"), being duly sworn, depose and state:

## INTRODUCTION AND AGENT BACKGROUND

1.      Affiant is a Special Agent with the U.S. Department of Health & Human Services, Office of Inspector General (HHS/OIG) in Kansas City, Missouri and has been so employed with HHS/OIG since October 2010. During that time, Affiant has been involved in many investigations involving frauds against the Department's programs, most commonly health care fraud. Consequently, Affiant is generally familiar with how various types of health care providers conduct financial transactions, keep records, and provide health care items and services to the public. Affiant is a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia and has received extensive training in conducting healthcare fraud investigations.

2.      Affiant began her career with the United States Department of Agriculture and was employed as a contract specialist from July of 2006 to August of 2008.  Affiant went to graduate school at the University of Kansas for Behavioral Science beginning in August 2008, and completed a Masters in Public Health from the University of Kansas in April 2012.  Affiant began working for HHS/OIG in October 2010 conducting national policy evaluations aimed at reducing fraud, waste, and abuse in programs across the Department, including managed care, laboratory tests, child care health and safety, and mental health.  Affiant has a Bachelor of Arts in Economics from the University of Notre Dame.

3.      Affiant is the case agent in a federal investigation of Doctor Philip D. DEAN (hereafter Dr. DEAN), and others known and/or unknown for alleged violations of federal criminal laws.

4.      This affidavit contains information personally known to Affiant as an agent working on this investigation, Affiant's previous investigative experience, and reports and statements made to Affiant by others working on this investigation, including Special Agents and other personnel from the United States Drug Enforcement Administration (DEA), and the Missouri Attorney

General's Office – Medicaid Fraud Control Unit (MFCU.)  Records obtained and analyzed for the purpose of this application were also provided by the Medicare and Medicaid programs, including Medicare contractors AdvanceMed, Health Integrity, LLC, and Wisconsin Physicians Service (WPS).  Since Affiant submits this affidavit for the limited purpose of supporting an application for a search warrant, it does not set forth every fact that Affiant or others have learned during the course of this investigation.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Dr. PHILIP DEAN has committed and is committing violations of federal criminal laws, including health care fraud, false statements related to health care matters, and distribution of controlled substances by a physician acting outside the usual course of medical practice (Title 18 U.S.C. § 1347, § 1035, and Title 21, U.S.C. § 841(a)(1)).

**Description of the Premises to be Searched**

6.      Agents and investigators request authority to search the clinic of Dr. DEAN, located at 511 E Booneslick Rd, Warrenton, MO 63383.  The clinic is a freestanding brick house with green shutters and a brown awning that reads "511 East Main."  There is also a white sign out front with Dr. DEAN's name and phone number.  Dr. DEAN is the only occupant of the building and he is the owner of record.  According to the Secretary of State for the state of Missouri, at this address there is a business named WASHINGTON NEUROLOGY ASSOCIATES which is associated with Dr. DEAN.  Attached to this affidavit are photographs of the clinic.  See Attachment A.

**Federal Laws Relating to Health Care Fraud**

7.      Dr. DEAN is registered under the provisions of the Controlled Substance Act, 21 U.S.C. § Section 823 et seq., as a practitioner and has been assigned a DEA registration number ending in 977 authorizing him to prescribe controlled substances under Schedules II - V.   For DEA registration purposes, Dr. DEAN uses the address of 511 E Booneslick Rd, Warrenton, MO

2

63383. Dr. DEAN is registered with Missouri Board of Registration for the Healing Arts as a medical physician and surgeon under license number ending in 74 expiring on January 31, 2018.

8.      Dr. DEAN is required to keep complete and accurate records of all controlled substances received, prescribed, sold, delivered or otherwise disposed of by him pursuant to 21 U.S.C. § 827 and 21 C.F.R. § 1304.01 at his medical offices.

### Relevant Medicare Provisions

9.      The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled.

10.     On September 12, 2012, Dr. DEAN signed a Medicare provider enrollment application. The application contained a certification section where the provider makes various representations, numbered as 8 in the application:

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard for their truth or falsity.

11.     Medicare providers agree in the provider agreement to retain clinical records for the period of time required by state law or five years from the date of service if there is no requirement in state law.  The Medicare provider enrollment application signed by Dr. DEAN specifically states under section #15 Certification Statement, item #4:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application.  The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statue and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

12.     Dr. DEAN's Medicare provider agreement, Section 4C, indicates that medical records are stored at the 511 East Booneslick Rd, Warrenton, MO 63383.

3

13.     Benefits are administered through different parts of the program, referred to as Part A, Part B, Part C, and Part D.  Parts B, and D are at issue in this case.  Part B covers services provided in an outpatient or clinic setting, and Part D covers prescription drugs. Private companies administer the Part D coverage, and beneficiaries choose a drug plan and pay a monthly premium to the government for that coverage.

14.     Medicare will only pay for medically necessary services and covered drugs.  (Medically necessary) is defined as health care services or supplies needed to diagnose or treat an illness, injury, condition, disease, or its symptoms, and that meet accepted standards of medicine.

15.     A covered Part D drug is defined as a drug that may be dispensed only upon a prescription and is used for a medically accepted indication. (42 U.S.C. § 1860D-2(e)(1)).  The term (medically accepted indication) means any use for a covered outpatient drug which is approved under the Federal Food, Drug, and Cosmetic Act, or the use of which is supported by one or more citations included or approved for inclusion in any of the approved compendia (42 U.S.C. § 1395w–102(e)(4)).

16.     When a beneficiary has Part D coverage, he or she can take a physician's prescription to a participating pharmacy.  The pharmacy will fill the prescription.  The beneficiary will pay a co-pay and receive the medication.  The pharmacy will then seek reimbursement from the Part D sponsor.  Both the Medicare program and the patient fund the prescriptions.

## The Controlled Substances Act as Applicable to Physician's Prescriptions

### A.      Scheduled Drugs

17.     The Controlled Substances Act, 21 U.S.C. § 801 et seq., governs the manufacture, distribution, and dispensing of various medications in the United States.  Included in this regulation are certain drugs, other substances, and their immediate precursors, which are defined as "controlled substances" under 21 U.S.C. § 802(6).  These controlled substances are listed within one of five established Schedules, Schedules I-V.  21 U.S.C. § 802(6).

4

18.     Placement of a controlled substance within a Schedule depends on the drug's medical
use, potential for abuse, and risk of dependence.  21 U.S.C. § 812(b).

19.     Schedule II controlled substances are drugs and other substances that have a high
potential for abuse, which may lead to severe psychological or physical dependence.  Schedule II
substances have a currently accepted medical use in treatment in the United States, sometimes
with severe restrictions.  Based on my training and experience, Schedule II drugs have a
diversion potential and have a street value.  The Schedule II drugs relevant to this investigation
are:

- Fentanyl (Potent, synthetic opioid pain medication with a rapid onset and short
duration of action, sometimes marketed as Subsys)
- Hydrocodone (a semi-synthetic opioid synthesized from codeine, one of the
opioid alkaloids found in the opium poppy)
- Oxycodone (a semisynthetic opioid synthesized from thebaine, an opioid alkaloid
found in the Persian poppy)
- Nucynta (centrally acting opioid analgesic of the benzenoid class)
- Hydromorphone (a centrally acting pain medication of the opioid class, it is a
derivative of morphine and sold under the name Dilaudid)

**B.      Prescribing Controlled Substances**

20.     A licensed health care professional, such as a physician, may prescribe controlled
substances.  To prescribe controlled substances, a licensed health care provider must have a DEA
registration number and must comply with all DEA regulations and all applicable federal laws.

21.     A prescription for a controlled substance must be dated and signed on the date issued.
An individual (e.g., a secretary or nurse) may be designated by the practitioner to prepare
prescriptions for the practitioner's later signature.  The practitioner is responsible for ensuring
that the prescription conforms to all requirements of the law and regulations, both federal and
state.

22.     Controlled substances may be dispensed and distributed lawfully by means of a
prescription if that prescription is issued for a legitimate medical purpose by an individual
practitioner acting in the usual course of his professional practice.  21 C.F.R. § 1306.04(a).

5

23.     Therefore, to issue lawful prescriptions for controlled substances, a medical practitioner must be registered with the DEA, and must issue the prescription for a legitimate medical purpose in the usual course of the practitioner's professional medical practice.

24.     A physician signing a prescription in blank, and having unauthorized, unlicensed, and non-DEA-registered individuals write and issue the prescription, is not a lawful prescription.

25.     Under Missouri law, a person who, for the purpose of obtaining a controlled substance, falsely assumes the title of…a physician, commits the offense of fraudulently attempting to obtain a controlled substance

26.     Physicians registered with the DEA are required to keep complete and accurate records of all controlled substances they receive, prescribe, sell, deliver or otherwise dispose of at the location listed on their DEA registration, pursuant to 21 U.S.C. § 827 and 21 C.F.R. § 1304.01.

27.     From my training and experience, I know physicians who illegally prescribe controlled drugs outside the usual course of professional practice and for other than a legitimate medical purpose frequently exhibit common indicators, or "red flags."  These include directing patients to pay for prescriptions in cash to avoid tracking by insurance companies, and directing patients to specific pharmacies to avoid scrutiny of multiple controlled substance prescriptions for the same patient in a short period of time.

**C.  Bona Fide Physician-Patient Relationship**

28.     Physicians must abide by any requirements imposed by their state medical boards with respect to proper prescribing practices and what constitutes a bona fide physician-patient relationship. 21 U.S.C. 823(f)(1), (4).

29.     The Missouri Board of Healing Arts may cause a complaint to be filed with the administrative hearing commission against any physician for:
   a.  Misconduct, fraud, misrepresentation, dishonesty, unethical conduct or unprofessional

conduct in the performance of the functions or duties of any profession licenses or regulated, including willfully and continually performing inappropriate or unnecessary treatment; Signing a blank prescription form; or dispensing, prescribing, administering or otherwise distributing any drug, controlled substance or other treatment without sufficient examination including failing to establish a valid physician-patient relationship pursuant to section 334.108, or for other than medically accepted therapeutic or experimental or investigative purposes duly authorized by a state or federal agency, or not in the course of professional practice, or not in good faith to relieve pain and suffering, or not to cure an ailment, physical infirmity or disease, except as authorized in section 334.104; exercising influence within a physician-patient relationship for purposes of engaging a patient in sexual activity; (§ 334.100.2 (4)(c), (4)(h), (4)(i))

b. Any conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient of the public; or incompetency, gross negligence or repeated negligence in the performance of the functions or duties of any profession licensed or regulated by this chapter.  For the purposes of this subdivision, "repeated negligence" means the failure, on more than one occasion, to use that degree of skill and learning ordinarily used under the same or similar circumstances by the member of the applicant's or licensee's profession; (§ 334.100.2 (5))

## The Medicaid Program

30.     Medicaid is a health care benefits program that provides medical items and services to the indigent, which the States and the federal government fund jointly. The federal government funds Medicaid through the CMS.  In Missouri, the federal government supplies approximately 60% of the funding for Medicaid.  The MO HealthNet Division, formerly known as the Division of Medical Services, which is an agency within the Department of Social Services, administers the Medicaid program.  In order to become a provider in the Medicaid program, the prospective provider must file and have an application accepted by the program. The Medicaid program reimburses enrolled providers for various health care related services, to include prescription drugs, which are prescribed in the normal course of medical practice, for a legitimate medical

7

purpose, by a qualified physician or other health care professionals acting within the scope of their licenses.

31.     Dr. DEAN first signed a Medicaid provider application and a Medicaid Participation Agreement for physician services on June 12, 1987. MO HealthNet approved the application and participation agreement referenced above in July 1987, and assigned Dr. DEAN a Provider Number ending in 305. Dr. DEAN submits claims to MO HealthNet using this unique Provider Number.

32.     Included in the application and participation agreement are various promises and attestations that Dr. DEAN will comply by the rules of the program, including those listed above, such as the requirement to comply with all regulations related to the proper and accurate submission of claims, and to make records available in the event of the Medicaid program conducting an on-site review. Part of Dr. DEAN's application reads, "By my signature below, I, the applying provider, read and agree that…I am responsible for all services provided and all billing done under my provider number regardless to whom the reimbursement is paid. It is my legal responsibility to ensure that the proper billing code is used and indicate the length of time I actually spend providing a service….I agree the Missouri Title XIX Medicaid manual, bulletins, rules, regulations and amendments thereto shall govern and control my delivery of service."

### Facts in Support of Application

### A. Interview with R.W. on February 10, 2017 at Chillicothe Women's Correctional Facility

33.     R.W. was a dually eligible Medicare/Medicaid patient of Dr. DEAN. R.W. became a patient of Dr. DEAN's around Spring 2009. R.W. is currently incarcerated at Chillicothe Women's Correctional Facility and has a history of substance abuse, as detailed below. Based on a review of Medicaid and Medicare claims, investigators found 17 separate prescriptions from Dr. Dean for R.W. for Fentanyl (including 10 prescriptions for Subsys) between May 2015 and April 2016. In total, Dr. DEAN prescribed over $250,000 of Schedule II medications paid for by

Medicaid and Medicare to R.W.  Based in part on R.W.'s claims history, R.W. was selected by agents for an interview.

34.     R.W. was interviewed on February 10, 2017 at the Chillicothe Women's Correctional facility.  Paragraphs 34-50 are based on information provided by R.W. in that interview.

35.     R.W. told agents in her interview that she voluntarily surrendered her Nursing license to the Missouri Board of Nursing in 2008.  This was in lieu of a suspension, which was brought on by R.W. either diverting or committing theft of controlled substances at her place of employment.

36.     R.W. has been convicted of Driving under the Influence (DUI) five times.  The first conviction, in 2007, was under the influence of alcohol.  The subsequent convictions were while under the influence of drugs.  R.W. believes some of the DUIs were caused or exacerbated by her seizures.  R.W. thinks the seizures were caused by the combination of too many drugs.

37.     R.W.'s first contact with Dr. DEAN in possibly the Spring of 2009, came via telephone when R.W. was being treated at CenterPoint Hospital (psychiatric inpatient.)  R.W. stated she found Dr. DEAN's name in a phone book there.

38.     At the beginning, Dr. DEAN treated R.W. for her "restless leg syndrome" and pain from a back injury (according to claim history, the primary diagnosis for R.W.'s first visit on August 7, 2009 was hypertension, and the secondary diagnosis was low back pain).  Dr. DEAN told R.W., "I want to wean you off OxyContin."  Between August 31, 2009 and December 14, 2009, Dr. DEAN prescribed R.W. OxyContin 5 times, increasing the dosage from 20 MG to 30 MG in the last two prescriptions.

39.     R.W. told Dr. DEAN that Vicodin (a narcotic—synthetic opioid) worked fine for her, but Dr. DEAN wanted R.W. to try Subsys.  Subsys is a sublingual fentanyl spray approved by the FDA for the treatment of breakthrough cancer pain.  Based on her claims history, R.W. has no

9

cancer diagnosis. As described in paragraph 13, Medicare would not pay for Subsys if it is not medically indicated, or prescribed for its approved use of treating cancer pain.

40.     R.W. told agents in her interview that she began working for Dr. DEAN in 2014. R.W. did office work, nursing duties, contacting patients, and having patients complete paperwork.

41.     R.W. told agents that Dr. DEAN does not like R.W.'s boyfriend, Travis Burdess (BURDESS). When R.W. broke up with BURDESS in 2015, Dr. DEAN took advantage of the breakup, and became R.W.'s boyfriend. As described in paragraph 28, physicians exercising influence within a physician-patient relationship for purposes of engaging a patient in sexual activity could cause the board to take action against the physician.

42.     When R.W. was arrested in May 2015, R.W. told agents that Dr. DEAN bonded R.W. out of jail and paid one-half of R.W.'s attorney fees by mailing a check to R.W.'s attorney. Dr. DEAN's bank records show Dr. DEAN wrote a check to CASH on February 25, 2016 with the memo line "Bail [last name of R.W.] Mong. Cty" for $9,500 and another check to CASH on March 8, 2016 with the memo line "Lofty B. [last name of R.W.] 3rd Bail." R.W. told agents that Dr. DEAN had R.W. sign a document saying that R.W. would work for him until she paid him back the money for bail and attorney fees. Dr. DEAN also wanted R.W. to promise not to see BURDESS anymore. R.W. felt as if Dr. DEAN held this money over her head, and R.W. had to do what he said.

43.     R.W. told agents that she lived with Dr. DEAN on an intermittent basis. R.W. would stay with Dr. DEAN if she had to work for him that day or for convenience. R.W. lost her drivers license following her last DUI and was unable to drive herself to work. Dr. DEAN would take her home the next day or another one of the employees in the office would drive her.

44.     R.W. stated that she was addicted to narcotics, and asked Dr. DEAN for additional prescriptions, above what she was already filling. Dr. DEAN obliged her requests and wrote R.W. additional prescriptions. Dr. DEAN additionally told her where to get these prescriptions filled (at different pharmacies), usually for cash; sometimes Dr. DEAN would pay for and pick up these prescriptions. From my training and experience, these practices raise concerns with the

legitimacy of patient/prescriber relationship. It is not typical for physicians to pay for patient and/or pickup patient's prescriptions. Paying for prescriptions in cash prevents insurance companies from tracking utilization and may allow patients to obtain controlled substances by fraud or deceit. These practices can be carried out at multiple pharmacies in a geographic area without being detected by law enforcement and healthcare providers.

45.     R.W. told agents that Dr. DEAN wrote narcotic prescriptions with R.W.'s father's name (E.W.) on them, but the prescriptions were for R.W. herself. Most of these additional prescriptions were filled at Stewart's or Wharf's pharmacies. R.W. stated that E.W. has never taken narcotics as far as R.W. knows, and R.W.'s mother, Beatrice W., knew about this scheme. This allegation is again discussed at paragraph 58. From my training and experience, if a physician writes prescriptions in someone else's name for a patient, this shows a desire to avoid scrutiny by pharmacists or insurance providers of the amount of controlled substances the patient is being prescribed.

46.     Approximately three years ago, R.W. told agents that she forged a prescription for Vicodin using Dr. DEAN's prescription pad. R.W. filled it at Costco pharmacy in St. Peters. Costco called Dr. DEAN to verify it and Dr. DEAN approved the prescription. Dr. DEAN later confronted R.W. about it saying "Never do that again." This allegation is further discussed at paragraph 60.

47.     R.W. told agents that she saw patients give cash to Dr. DEAN in order to receive additional prescriptions for whatever they wanted.

48.     R.W. told agents at her interview that Dr. DEAN took advantage of R.W. sexually. Following surgery on R.W.'s leg, Dr. DEAN forced himself on R.W. for intercourse. R.W. could not physically resist him due to the surgery, but felt as if she was assaulted.

49.     Following R.W.'s arrest and incarceration, Dr. DEAN has written R.W. multiple letters talking about their relationship. R.W. has since discarded these letters.

50.     R.W. told agents that Dr. DEAN wrote messages to R.W.'s son, Brady PICKLE on Facebook.  Around December 22, 2016 Dr. DEAN posted on PICKLE's Facebook wall referencing R.W. being in prison.  R.W. was upset by this because PICKLE's friends did not know that R.W. is in prison.  PICKLE's father subsequently blocked Dr. DEAN from PICKLE's Facebook page.

51.     R.W. told agents that R.H., a dually-eligible Medicare and Medicaid beneficiary and patient of Dr. DEAN, is currently an employee for Dr. DEAN.  R.W. believes R.H. is addicted to narcotics and is very close to Dr. DEAN.  Dr. DEAN has had R.H. write and communicate to R.W. and R.W.'s son, PICKLE.  On December 24, 2016, PICKLE told R.W. that R.H. sent messages to PICKLE on Facebook; R.H. said that R.W. was trying to call PICKLE.  PICKLE subsequently blocked R.H. on Facebook.

## B.  Examining R.W.'s Motor Vehicle Accidents, Arrests, and Prescription Data from Dr. DEAN

52.     Following the interview with R.W., agents began to gather information to determine if R.W. was telling the truth.  Agents examined R.W.'s prescribing history to determine if the prescriptions were medically necessary and medically indicated.  According to claims history, on March 4, 2011 R.W. filled a prescription for 60 units of 20 MG of Oxycontin prescribed by Dr. DEAN.  There was no corresponding office visit for this prescription.  Less than two weeks later, on March 17, 2011, R.W. had an office visit with Dr. DEAN.  According to claims history, on that day R.W. filled another prescription from Dr. DEAN for 60 units of 10 MG of Oxycontin.  That brought R.W.'s Morphine Milligram Equivalents (MME) per day to 90.  According to the Centers for Disease Control and Prevention, clinicians should avoid increasing dosage to 90 MME/day or carefully justify a decision to titrate dosage to 90 MME/day.  According to the National Crime Information Center (NCIC), the day before the additional prescription for Oxycontin was written, on March 16, 2011, R.W. was arrested for DUI by the O'Fallon Police Department.

53.     NCIC records show that R.W. was arrested by Lincoln County Sheriff's Office for a DUI
and Possession of a Controlled Substance that occurred on June 8, 2013.  According to claims
history, R.W. had an office visit with Dr. DEAN five days after the DUI, on June 13, 2011.  A
week later, on June 22, 2013, R.W. filled a prescription for 120 units of 10/325 MG of
Hydrocodone/Acetaminophen prescribed by Dr. DEAN.  In my training and experience,
prescribing to a patient known to have encounters with law enforcement related to substance use
is likely to be outside the scope of what is medically necessary.  According to guidelines set forth
by the Missouri Bureau of Narcotics and Dangerous Drugs, physicians may not prescribe or
dispense controlled substances to a patient for chemical dependency unrelated to intractable pain
or to a patient who the physician knows, or should know is using the medication in a non-
therapeutic manner.

54.     The Missouri Highway Patrol arrested R.W. on May 4, 2015 for Aggravated Second
Degree Assault – Operating a Vehicle While Intoxicated, Resulting in an Injury.  R.W.'s blood
test from this arrest identified Hydrocodone, a pain medication, and Tramadol, a muscle relaxant
in her blood.  R.W. was not under the influence of alcohol at the time of the crash.  At the time of
the crash, R.W. was under the care of Dr. James STURM, a pain management specialist.  R.W.
filled a 15 day supply of 10/300 MG of Hydrocodone and 50 MG of Tramadol on April 23,
2015, both prescribed by Dr. STURM.  According to medical records from an emergency room
visit on May 7, 2015, R.W. stated that she "was fired from pain management doctor and is out of
pain medication.  PCP would not write for pain medication per patient."  According to the
medical records, R.W.'s Primary Care Physician at this time was Dr. DEAN.  The emergency
room physician prescribed a Dilaudid injection and gave R.W. a prescription for a five day
supply of Percocet (Oxycodone HCL/Acetaminophen.)

55.     According to Medicaid claims, on May 11th and 13th, 2015, Dr. DEAN saw R.W. for
seizures and migraines.  Medicaid claims show that on May 11th R.W. filled a prescription for 20
MG of Oxycodone prescribed by Dr. DEAN.  On May 12th, R.W. filled a prescription for
Vicodin (Hydrocodone/Acetaminophen) prescribed by Dr. DEAN.  On May 15th, R.W. filled a
prescription for 400 MCG of Fentanyl (Subsys), also prescribed by Dr. DEAN.  Medicaid paid a
combined $9,000 for these drugs.  The MME of the Oxycodone and Vicodin is 90, the high

dosage that the CDC advises clinicians against using. The MME of Subsys at the dose is 432, almost 5 times what the CDC advises clinicians against using.

56.     According to medical records obtained by Medicaid, subsequent office visits with Dr. DEAN mentioned R.W.'s left leg being in a cast but not the reason for the accident. Dr. Dean continued to prescribe opioids, including Fentanyl (Subsys.)

57.     According to bank records, between May 25, 2016 and March 8, 2016, Dr. DEAN paid $46,000 for the bail of R.W., who had been arrested and charged with Aggravated Assault resulting from the May 4, 2015 motor vehicle accident.

**C. Payment for Prescriptions**

58.     According to bank records, on at least five occasions, Dr. DEAN made out checks to STEWARTS PHARMACY involving R.W. On the memo line of the checks, there were notes referring to R.W.'s medications, including pain medications, from May-July 2015. There are not corresponding claims for these medications in R.W.'s Medicaid data. From my training and experience, these practices raise concerns with the legitimacy of patient/prescriber relationship. It is not typical for physicians to pay for patient and/or pickup patient's prescriptions. Paying for prescriptions in cash prevents insurance companies from tracking utilization and may allow patients to obtain controlled substances by fraud or deceit. These practices can be carried out at multiple pharmacies in a geographic area without being detected by law enforcement and healthcare providers.

**D. Prescriptions Obtained Under E.W.'s Name**

59.     As previously discussed by R.W. in her interview at paragraph 44, the following appears to be evidence to corroborate R.W. obtaining prescriptions from Dr. DEAN written under her father's name. According to WHARF PHARMACY records, on May 21, 2016, there were two medications filled at WHARF'S PHARMACY in the name of E.W., R.W.'s father, one for hydrocodone, a pain medication, and one for an antibiotic. The total amount paid for these drugs was $29.84. According to bank records, on May 22, 2016, there was a $29.84 credit card charge

that cleared from Dr. DEAN's account for WHARF'S PHARMACY.  As discussed in paragraph 23, a physician cannot allow other non-licensed persons to issue prescriptions for controlled substances in his name.

60.     During an interview with investigators on September 7, 2016, Betty W., R.W.'s mother, reported to investigators that E.W. does not take any pain control medications.  Betty W. was again interviewed by the affiant on May 25, 2017.  Betty W. stated that she could not recall if E.W. had any pain medications, except maybe one that he had tried and experienced immediate side effects.  Betty W. stated that she gave the rest of these medications back to Dr. DEAN. Once dispensed to the patient (the ultimate user), controlled substances cannot be returned to the prescriber or pharmacy (a DEA registrant) for re-dispensing.  21 C.F.R. § 1304.22(c) requires registrants to maintain records for the receipt of controlled substances to include the name, address and DEA registration of the person from whom the controlled substances were acquired.

**E.  Prescriptions Obtained by Forgery**

61.     As previously discussed in paragraph 45, R.W. told investigators during her interview that she forged prescriptions and attempted to fill them at Costco Pharmacy.  In following up on this information, on March 2, 2017, DEA investigators obtained copies of the original prescriptions for R.W. from Costco Pharmacy in St. Peters.  The prescription dated 1/31/13 and filled 2/4/13 contains writing that differs from the other prescriptions provided by the same pharmacy.  This suggests that R.W. did forge the prescription that was later filled upon permission from Dr. DEAN to Costco Pharmacy.

62.     During a call recorded from Chillicothe Women's Correctional Facility on February 18, 2017, R.W. instructs boyfriend Travis BURDESS, as he is going through her wallet, to discard of blank prescriptions from Dr. DEAN.  Based on my training and experience, physicians should not be pre-signing or giving blank prescriptions to a patient.

15

**F. Interview of TRAVIS BURDESS by Investigators on January 26, 2017**

63.     BURDESS is the boyfriend of R.W. and was approached by investigators for an interview on January 26, 2017.  BURDESS stated from the beginning that he does not like Dr. DEAN.  The following paragraphs contain what he communicated to investigators regarding R.W.'s relationship with Dr. DEAN.  BURDESS is currently in a relationship with R.W. BURDESS stated that six year ago, he walked away from R.W. because of addiction to drugs. R.W. went to Dr. DEAN after that.

64.     R.W. told BURDESS that Dr. DEAN was giving R.W. drugs for sex.

65.     BURDESS stated that in the last three years, R.W. began working for Dr. DEAN because R.W. was addicted to the pills; it was easy to obtain the drugs she wanted.  R.W. would take the drugs and Dr. DEAN would then take advantage of her sexually.  R.W. would call BURDESS crying.  To BURDESS' knowledge, this happened both at work and at Dr. DEAN's home.

66.     According to BURDESS, R.W. was living with Dr. DEAN when R.W. was arrested in February 2016.  Dr. DEAN gave R.W. between $60-80,000 for bail (for three separate bails).

**G. Interview of Joe ROSICK by Investigators on April 25, 2017**

67.     Joe ROSICK was identified by investigators as the main sales representative for Insys Therapeutics, the maker of Subsys, from June 2014-July 2016.  ROSICK's biggest prescriber for Subsys was Dr. DEAN.  On September 12, 2014, a pharmacist with the Walgreens in Warrenton, MO, filed a hotline complaint with the Missouri Medicaid Audit and Compliance Hotline.  The complainant indicated that the pharmacy manager, Amanda UPDEGRAFF called Dr. DEAN's office regarding a prior authorization and the Subsys drug representative answered the phone.  In my training and experience, drug representatives do not typically work inside the prescribing doctor's office, but rather visit the office to hand out materials and educate the doctor.

Investigators interviewed ROSICK to understand his role in Dr. DEAN's office and his interactions with Dr. DEAN.

68.     ROSICK stated that he believed Dr. DEAN and R.W. were sexually involved.  ROSICK told Dr. DEAN that R.W. was on too many opioids.  Dr. DEAN stated that R.W. had a seizure disorder.  Dr. DEAN knew these seizures caused her vehicle accidents.  ROSICK told Dr. DEAN that seizures can also be caused by being on too many opioids.

69.     When ROSICK was fired by Insys in July 2016, ROSICK went to work for Dr. DEAN for a month.  ROSICK performed medical assistant duties, such as taking vitals and blood pressure and patient histories.  ROSICK stopped working for Dr. DEAN a month later, in August 2016, in part because of a "blow out" with Dr. DEAN about R.W.

## H.  Pharmacies

### KROGER PHARMACY

70.     On or around September 8, 2016, a pharmacist from KROGER PHARMACY in Troy called in to the HHS/OIG hotline to file a complaint about Dr. DEAN.  On approximately three separate occasions, a new patient of Dr. DEAN came into the pharmacy with a prescription for pain medication, requesting to pay in cash and claiming to not be insured. KROGER PHARMACY requests the last four digits of a patient's social security numbers to verify whether they have insurance. The pharmacist stated patients told her Dr. DEAN asked the patients to pay cash at the pharmacy and "will be mad" if the patients use their insurance to fund prescription drugs.  In my training and experience, paying for prescriptions in cash prevents insurance companies from tracking utilization and may prevent health care benefit programs from tracking the amount of scheduled medications a physician prescribes.  Physicians may want to do this to avoid being labeled as an "over-prescriber" of opiates.

### WHARF PHARMACY

71.     During an onsite visit from the DEA in December 2016, pharmacist Andrew PALANS at WHARF PHARMACY expressed concerns regarding Dr. DEAN.  During a later interview with

investigators, PALANS stated that he had not filled any of Dr. DEAN's prescriptions since a falling out in July 2016. In May 2016, a patient of Dr. DEAN's told PALANS that Dr. DEAN had informed the patient that they were required to fill prescriptions at WHARF PHARMACY. PALANS sent Dr. DEAN a fax telling Dr. DEAN not to tell patients they were required to fill prescriptions at WHARF PHARMACY. Dr. DEAN did not respond. In July 2016, a patient brought in a prescription from Dr. DEAN to be filled, but Dr. DEAN had altered the prescription by crossing out a controlled substance that had been written on the prescription. PALANS called Dr. DEAN and Dr. DEAN became belligerent. PALANS then sent Dr. DEAN a fax stating that WHARF PHARMACY would no longer fill any of Dr. DEAN's prescriptions.

72.     PALANS estimated 90% of Dr. DEAN's patients who filled at WHARF PHARMACY were being prescribed as many as five different controlled substances at one time. Dr. DEAN would add an antibiotic at times, but the patients would frequently ask that the noncontrolled substance not be filled. In my training and experience, this is unusual. With a typical patient/prescriber relationship, patients fill all the drugs that their physician prescribes.

**COSTCO PHARMACY**

73.     The DEA spoke with the pharmacy manager at COSTCO PHARMACY in St. Charles, Gregory ALLES. ALLES recalled an incident from July 27, 2015. Dr. DEAN was refusing to place diagnosis codes on prescriptions for what were considered "high alert drugs," which ALLES described as certain narcotic medications. COSTCO PHARMACY requires the diagnosis code be placed on a prescription for certain medications. ALLES contacted Dr. DEAN about putting the diagnosis codes on his prescriptions, but Dr. DEAN got mad and told ALLES to tell his patients to find another pharmacy. ALLES posted a note in the pharmacy telling the other pharmacist not to fill high alert drugs for Dr. DEAN.

**AVELLA PHARMACY**

74.     On April 20, 2017, investigators spoke with the staff of AVELLA PHARMACY including John RANIERO, pharmacist in charge, Stephanie THOMAS, pharmacist, and Teri LEONHARDT, pharmacy technician. Dr. DEAN was one of the first physicians to send his Subsys patients to AVELLA PHARMACY. THOMAS described Dr. DEAN as difficult to work with. Dr. DEAN wanted to send all of his patients to AVELLA PHARMACY for their

18

medications. THOMAS stated she had to tell several patients that it was their choice where they filled their medications, Dr. DEAN could not direct them where to go. At the end of February 2017, AVELLA PHARMACY decided to stop filling prescriptions for one patient of Dr. DEAN's, R.H. THOMAS and LEONHARDT were concerned because R.H. exhibited slurred speech on telephone calls, and LEONHARDT knew that R.H. had a three year old at home that R.H. took to preschool every day. LEONHARDT stated that even Dr. DEAN had told her that R.H. "was on enough stuff already." In my training and experience, this statement indicates that Dr. DEAN has knowledge that he is over-prescribing medication.

75.     THOMAS stated that she knew that two of Dr. DEAN's patients were on Subsys without a diagnosis of cancer: J.M. and M.P.

**I. Prescribing of Fentanyl (Subsys) by Dr. DEAN**

76.     Subsys is classified as a Transmucosal Immediate Release Fentanyl product and therefore only available through a Risk Evaluation and Mitigation Strategies (REMS) program as required by the FDA.

77.     Every prescriber and pharmacy must complete an education program to prescribe or dispense TIRF drugs. The program states that TIRF medicines are indicated only for the management of breakthrough pain in adult patients with cancer 18 years of age or older who are already receiving and who are tolerant to regular opioid therapy for underlying persistent cancer pain. The only exception is for Actiq and its generic equivalents, which are approved for cancer patients 16 years of age and older. There are no other accepted indications for use for TIRF drugs in REMS program.

78.     The Prescriber Enrollment Form requires the prescriber to acknowledge that "I understand and agree to comply with the TIRF REMS Access program requirements for prescribers." In addition, The Patient-Prescriber Agreement Form, which is required for each patient in the TIRF REMS Access program, includes the statement that, "I understand that TIRF medicines are indicated only for the management of breakthrough pain in patients with cancer,

who are already receiving, and who are tolerant to, around the clock opioid therapy for their underlying persistent pain."

79.     A Medicare contractor identified 122 Medicare prescriptions of Subsys associated with Dr. DEAN, for a total paid amount of $2,051,586.96.  Of these, 27 prescriptions and five unique beneficiaries were found to have no cancer diagnosis through Part A or Part B analysis.  These accounted for $581,979 paid.  These beneficiaries included R.W. and J.M.

**J.  Law Enforcement Contact with Dr. DEAN**

80.     On March 16, 2017, the Warrenton Police Department was called to 200 West Booneslick in regard to an assault.  The victim, S.T., advised while at an appointment with Dr. DEAN, he was verbally abusive towards her.  Dr. DEAN wrote S.T. several prescriptions.  S.T. left the office and advised Dr. DEAN that he could not speak to her like that anymore and she was going to report him.  Dr. DEAN chased S.T. out of the building and grabbed her left bicep, spinning her around as he attempted to grab the prescription out of her hands.  S.T. told Dr. DEAN to let go as he was hurting her.  Dr. DEAN went back inside.

81.     On May 8, 2017, a patrol officer for the Warrenton Police Department responded to a well being check of a male subject possibly asleep or passed out in his vehicle near Dr. DEAN's office.  The male was identified as T.C.  T.C., who lives in Troy, MO explained to the officer that he is a patient of Dr. DEAN's and receives Fentanyl from him and other medications.  T.C. told the officer that he comes to Warrenton for the medications because Dr. DEAN doesn't "get in trouble" for prescribing.

**K.  Involvement of Facebook—Jailhouse Call Recordings**

82.     On or around December 1, 2016, R.W. was incarcerated at the Vandalia Women's Diagnostic and Reception Center.  Shortly after, R.W. moved to Chillicothe Women's Correctional Facility.  Calls placed by R.W. from these facilities were obtained by the DEA.

83.     On December 25, 2015 R.W. stated to her boyfriend Travis BURDESS that since Dr. DEAN couldn't reach R.W.'s son, Brady PICKLE on Facebook, Dr. DEAN had R.H. do it for him. R.W. stated that Dr. DEAN is harassing PICKLE. R.W. stated that PICKLE's father, Doug PICKLE is ready to take Brady PICKLE off Facebook because people associated with R.W. are "messing" with him about his mother being in prison.

84.     On February 18, 2017, R.W. told BURDESS that she received a postcard from Dr. DEAN. The postcard stated that R.W. should remove Christopher REED from her Facebook account. REED is a former patient of Dr. DEAN's and rents one of Dr. DEAN's houses. R.W. stated that Dr. DEAN had been on her Facebook page. R.W. told BURDESS where to find her Facebook account password and asked him to delete her Facebook account. BURDESS was unsuccessful in deleting her account.

85.     On February 18, 2017, R.W. told her son, PICKLE that BURDESS was not successful deleting her Facebook account and asked PICKLE to help her by doing it. PICKLE was able to delete the first account. After deleting one account, R.W. asked her son to look at another one of Facebook accounts. PICKLE explained to her that she could unfriend Dr. DEAN and block him, but he was unable to deactivate that account because R.W. did not have the password.

**L.  Interaction on Facebook and Text Messaging between patients and Dr. DEAN**

86.     On May 18, 2017, the affiant spoke with BURDESS regarding communications between R.W. and Dr. DEAN. BURDESS stated that Dr. DEAN communicated with R.W. via text messages, phone calls and Facebook messages. BURDESS assumed that Dr. DEAN communicated with other patients in the same way.

87.     During the April 20, 2017 interview of the staff of AVELLA PHARMACY, pharmacist THOMAS and pharmacy technician LEONHARDT stated that they were aware that Dr. DEAN frequently text messaged with his patients. One patient, J.M. told THOMAS that she needed to reach Dr. DEAN on his cell phone as that was the only way to communicate with him on days that he was not in the office.

21

**M.  Phone Tolls for Dr. DEAN – December 2016 – January 2017**

88.     At the end of January 2017, the DEA obtained a phone toll for Dr. DEAN for calls and texts between December 19th, 2016 and January 17th, 2017.  The phone number Dr. DEAN corresponding with the most is associated with patient R.H.  R.H. was mentioned by R.W. during her interview with agents as being very close with Dr. DEAN.  R.H. also was the patient told by AVELLA PHARMACY in February 2017 that they would no longer fill her prescriptions.  R.W.'s son PICKLE told R.W. that R.H. was contacting him on Facebook about R.W.  R.H. and Dr. DEAN made contact 3,399 times, an average of 117 times per day.  In my training and experience, this is not typical of a patient-prescriber relationship.

89.     The tolls show that Dr. DEAN contacted other numbers associated with patients, including patient L.F. (491 times, an average of 17 times per day), and M.P. (340 times, and average of 12 times per day.)  L.F. is friends with Dr. DEAN on Facebook.  M.P. is being prescribed Fentanyl (Subsys) by Dr. DEAN and does not have a cancer diagnosis.

90.     The tolls also show that Dr. DEAN contacted Betty W., R.W.'s mother, 8 times between December 22nd, 2016 and January 16th, 2017.

**N.  Interview with Betty W., mother of patient R.W., on May 25, 2017**

91.     On May 25, 2017 the affiant interviewed Betty W. regarding her interactions with Dr. DEAN.  Betty W. stated that her husband, Eddie W. was a patient of Dr. DEAN's.  Eddie was currently living in an assisted living facility.  Betty W. was glad to get her husband away from Dr. DEAN.  Dr. DEAN instructed Betty W. to give any medications that did not work for her husband back to him.  Once dispensed to the patient (the ultimate user), controlled substances cannot be returned to the prescriber or pharmacy (a DEA registrant) for re-dispensing.  21 C.F.R. § 1304.22(c) requires registrants to maintain records for the receipt of controlled substances to include the name, address and DEA registration of the person from whom the controlled substances were acquired.

92.     Betty W. stated that Dr. DEAN tried to get her to be his patient.  Betty W. has two cracked vertebrae in her back and has had back problems for a long time.  Dr. DEAN wanted to prescribe Betty W. pain medications.  Betty W. told Dr. Dean that she was not into doctors or pain pills.  Dr. DEAN told Betty W. that these medications worked for R.W.'s back pain; they would work for Betty W. as well.

93.     Dr. DEAN called Betty W. on May 15th, 2017, the day before R.W. had a parole hearing. Dr. DEAN thought that board would release R.W. that day and R.W. would come back to work for him.  Betty W. stated the Dr. DEAN is always talking about R.W. coming back to work for him.  Betty W. told Dr. DEAN that R.W. was talking to the board, not getting out.  Dr. DEAN said "Do you mean I'm going to have to get a different nurse?"

94.     Betty W. recalled that Dr. DEAN came to her house 2-3 months prior to the interview. Betty W. was shocked to see Dr. DEAN and he came in and walked around the house and stayed awhile.  Betty W. sat down at the kitchen table to talk to Dr. DEAN and Dr. DEAN got up and came around behind Betty W's chair and started massaging her back.  Betty W. jumped out of her chair and ran back to the kitchen.  Betty W. told the affiant, "That's what he would do to [R.W.] when he wanted to have sex with her."  Betty W. felt very uncomfortable and then R.W. called Betty W. from prison.  Dr. DEAN asked if he could speak her R.W.  Betty W. said "no" and that it was "a private conversation" and Dr. DEAN needed to leave.  Betty W. stated that she locked the doors behind him and did not plan to let him in to the house again.  Betty W. did not feel that Dr. DEAN's behavior was appropriate and she stated that she was worried that other people might trust him because he is a physician.

## O.  Missouri Medicaid Audit and Compliance (MMAC) Visit to Dr. DEAN's Clinic

95.     On March 11, 2016, three auditors and an investigator from the MMAC went to Dr. DEAN's clinic at 511 E Booneslick Rd, Warrenton, MO, where Dr. DEAN kept and provided medical records.  Dr. DEAN had been referred for an audit for two reasons.  First, he was the highest prescriber of the fentanyl spray Subsys in the Missouri Medicaid program.  Second, Dr. Dr. DEAN refused to send in documentation for his patients when requested by the Clinical

Services division of Missouri Medicaid. The auditor in charge, Ashley BATES, R.N. noticed that Dr. DEAN's patient files had been combed through, and the requested dates of service were clipped together. BATES further noted that many records had the original date written in pen and then the date of service requested written over that date with a black permanent marker. Some records appeared to be the same across multiple altered dates of service. BATES referred the issue of altered and "cloned" medical records to the Missouri Board of Healing Arts.

96.     Dr. DEAN further stated to BATES that he had no employees, just "independent contractors." Dr. DEAN did not have a nurse, but a woman who lost her license and is working more as a "clerk." She rooms patients, takes their histories, blood pressure, medication side effects, and answers the phone. Her name was R.W.

**P. Prescriptions Obtained Under E.W.'s Name**

97.     As previously discussed by R.W. in her interview at paragraph 45, there is evidence that corroborates R.W. illegally obtaining prescriptions from Dr. DEAN that he wrote under the name of R.W.'s father, E.W. According to WHARF PHARMACY's computer system records, including signature logs, the following controlled substance prescriptions were issued by Dr. DEAN under E.W.'s name between August 2015 and April 2016:

| Script Written For | Script Date | Schedule II Drug | Quantity | Signed for By |
|---|---|---|---|---|
| E.W. | 8/27/2015 | Hydro 10/300 | 40 | E.W. |
| Office Visit Billed for E.W. 9/28/2015 | | | | |
| E.W. | 10/20/2015 | Hydro 10/325 | 90 | Unknown |
| E.W. | 11/20/2015 | Oxycodone 20 | 90 | R.W. |
| Office Visit Billed for E.W. 11/24/2015 | | | | |
| E.W. | 12/5/2015 | Hydro 10/325 | 90 | Unknown |
| E.W. | 12/15/2015 | Oxycodone 20 | 90 | R.W. |
| E.W. | 1/13/2016 | Hydro 10/325 | 40 | Dr. DEAN |
| E.W. | 2/9/2016 | Oxycodone 20 | 60 | R.W. |
| E.W. | 2/21/2016 | Hydro 10/325 | 60 | Dr. DEAN |
| E.W. | 2/21/2016 | Omnicef (non C2) | | Dr. DEAN |
| E.W. | 3/7/2016 | Oxycodone 20 | 90 | R.W. |
| E.W. | 3/23/2016 | Hydro 10/325 | 120 | Dr. DEAN |
| Office Visit Billed for E.W. 3/28/2016 | | | | |

24

| E.W. | 4/23/2016 | Hydro 10/325 | | 120 | R.W. |
|------|-----------|--------------|--|-----|------|

98.      As the table above in paragraph 97 shows, on February 21, 2016, there were two medications filled at WHARF'S PHARMACY in the name of E.W., R.W.'s father, one for hydrocodone, a pain medication, and one for an antibiotic.  As discussed previously in paragraph 59, these medications appear to have been paid for by Dr. DEAN[1].  These drugs were also signed for by Dr. DEAN.  As discussed in paragraph 23, a physician cannot allow other non-licensed persons (e.g. R.W.) to issue prescriptions for controlled substances in his name.

99.      As previously discussed in paragraph 60, R.W.'s mother, Betty W., reported that her husband, E.W. did not take any pain control medications.  E.W. had tried once and immediately experienced side effects and Betty W. gave these medications back to Dr. DEAN, who had previously prescribed them.  According to Betty W.'s statement, it appears all controlled substance prescriptions written out to E.W. after August 27, 2015 were diverted to either R.W. or Dr. DEAN.  Further, in my training and experience, controlled substance prescription fill dates are typically closely linked to the date for which an office visit is billed by the prescribing doctor to the patient's health care benefits program.  Federal law requires that controlled substance prescriptions must be dated as of and signed on the date of issue.  Doctors typically want to personally examine patients shortly before prescribing  drugs that contain controlled substances.  As the table in paragraph 99 shows, none of the office visits billed for E.W. correspond to the days preceding the fill dates of the prescriptions.  This indicates that the prescriptions were not prescribed to him during an office visit examination.  Finally, as shown in the table in paragraph 99, the only pickup signature attributed to E.W. is the first date a controlled substance was filled, August 27, 2015.  This further supports that subsequent prescriptions were diverted to R.W.  This warrant seeks to obtain evidence regarding E.W., as discussed in further detail in the attachment.

---

[1] The affidavit in support of Case Number 4-17-MJ-5139-NAB incorrectly stated the month of this transaction.  It occurred in February, not May.

## Q. LEGACY DRUGSTORE

**Dr. DEAN Prescribing Habits**

100.    DEA investigators interviewed Pharmacist Andrew BOYET regarding Dr. DEAN on July 18, 2017.  BOYET stated the pharmacy has not been open long, but Dr. DEAN was known to him.  BOYET stated that many of Dr. DEAN's patients are cash-paying customers.  BOYET said that Dr. DEAN is known to write a combination of narcotics, benzodiazepines, and a muscle relaxer that BOYET described as the "Trinity."  In my training and experience, paying for prescriptions in cash prevents insurance companies from tracking utilization and may prevent health care benefit programs from tracking the amount of scheduled medications a physician prescribes.  In my training and experience, this combination of drugs known as the "Trinity" or "Holy Trinity" has a very high abuse risk that generally outweighs its potential therapeutic benefits over alternative medication regimens with lower abuse potential.

**Patient Living with Dr. DEAN**

101.    BOYET has recently seen Dr. DEAN in the pharmacy with one of his patients, L.R., who is reportedly living with Dr. DEAN.  LEGACY pharmacy records show that L.R. has filled four prescriptions at the pharmacy, written by Dr. DEAN, since March 2017.  Medicare paid for the prescriptions in July; L.R. paid for the copays in cash.  The prescription on April 1 was paid for in cash.  In my training and experience, a patient paying for prescriptions with cash prevents insurance companies from tracking utilization and may prevent health care benefit programs from tracking the amount of scheduled medications a physician prescribes:

| Date Filled | Drug | Type of Drug | Quantity | Schedule |
|---|---|---|---|---|
| 4/1/2017 | Lorazepam 1 MG Tablet | Anti-Anxiety | 90 | 4 |
| 7/1/2017 | Dextroamp-Amphetamin 20 | Amphetamine | 90 | 2 |
| 7/1/2017 | Lorazepam 2 MG Tablet | Anti-Anxiety | 90 | 4 |
| 7/26/2017 | Lorazepam 2 MG Table | Anti-Anxiety | 90 | 4 |

102.    As stated previously and as described in paragraph 28, physicians exercising influence within a physician-patient relationship for purposes of engaging a patient in sexual activity could cause the board to take action against the physician.   Further, from my training and experience, these practices raise concerns with the legitimacy of patient/prescriber relationship.   It is not typical for physicians to pay for the patient's drugs and/or pickup patient's prescriptions.   This warrant seeks to obtain evidence regarding L.R. as discussed in further detail in the attachment.

**Patients Fired and Then Allowed to Continue to Fill**

103.    BOYET stated that he has spoken over the phone to Dr. DEAN about another patient of Dr. DEAN's named M.R.   Dr. DEAN called the pharmacy to tell them that he had "fired" M.R. as a patient because Dr. DEAN had found out M.R. was not taking his medication as prescribed. However, Dr. DEAN called back a couple weeks later to say M.R. was a patient again.   Dr. DEAN stated that M.R. had been involved in an accident, so he was treating him again.   Dr. DEAN told BOYET that he was seeing M.R. on a week-by-week basis and doing pill counts. This warrant seeks to obtain evidence regarding M.R. as discussed in further detail in the attachment.

104.    Pharmacy technician Amy DORMAN stated that she spoke to Dr. DEAN about another patient of his, W.R.   Dr. DEAN found out that W.R. was using illicit drugs, so he "fired" W.R. DORMAN stated that Dr. DEAN later called back to say that W.R. agreed to stop using illicit drugs, so Dr. DEAN took him back as a patient.   This warrant seeks to obtain the medical record of W.R.   DORMAN also stated that Dr. DEAN's patients have told her that Dr. DEAN is telling them they have to use LEGACY DRUGSTORE to fill their prescriptions.

**R. Patients that Overdosed**

105.    On March 22, 2017, DEA investigators interviewed O.M., a former patient of Dr. DEAN. O.M.'s boyfriend, M.S., also a patient of Dr. DEAN, died of an overdose on May 16, 2016.   The overdose was caused by M.S. chewing on a fentanyl patch prescribed by Dr. DEAN on the date of his death.   O.M. stated that Dr. DEAN required them to fill their drug prescriptions at a specific pharmacy.   On the date of M.S.' death, he had filled prescriptions at WHARF

PHARMACY.  O.M. described herself and M.S. as individuals who were in search of pills in order to abuse them.  O.M. also stated that Dr. DEAN prescribed M.S. Subsys (fentanyl), which MILLER knew was intended for cancer patients.  This warrant seeks to obtain evidence regarding M.S. as discussed in further detail in the attachment.

106.    On June 5, 2015, Warrenton Police responded to the overdose of K.K., a patient of Dr. DEAN's.  K.K. was taking Subsys (fentanyl) prescribed by Dr. DEAN.  K.K., following an administration of Narcan by a paramedic, stated that she did not want to die and she never overdosed, she only took the medication as prescribed by her doctor.  K.K. stated that she takes the medication for back pain.  This warrant seeks to obtain evidence regarding K.K. as discussed in further detail in the attachment.

107.    On August 28, 2015, Warrenton Police responded to an incident involving Dr. DEAN patient M.M.  A friend of M.M. contacted the police because M.M. refused to be transported to the hospital due to issues with her prescription medications.  M.M. showed the officers numerous bags of Subsys (fentanyl) prescribed by Dr. DEAN.  M.M. stated to police that she felt Dr. DEAN had been giving her too much medication.  This warrant seeks to obtain evidence regarding M.M. as discussed in further detail in the attachment.

**S. Prescribing of Subsys (Fentanyl) by Dr. DEAN**

108.    As previously discussed in paragraphs 76-79, Subsys (fentanyl) is a part of a Risk Evaluation and Mitigation Strategies (REMS) program and requires education and enrollment in order to be prescribed.  Dr. DEAN signed the Prescriber Enrollment Form on July 29, 2014 and again on June 8, 2016.

**Patient J.M.**

109.    On August 25, 2016, agents interviewed J.M.  J.M. stated that he and Dr. DEAN know Subsys (fentanyl) is a pain medication for cancer patients.  J.M. has discussed this with Dr. DEAN.  Dr. DEAN told him, his usage of Subsys is an "off label usage".  J.M. recalled signing a contract to receive Subsys.  As stated previously, Medicare does not pay for the off-label usage

28

of Subsys (fentanyl). Many insurance companies that contract with the Medicare Part D program to provide prescription drug coverage require a Prior Authorization for drugs that are high risk, such as Subsys (fentanyl). A Prior Authorization is a process used by some health insurance companies to determine if they will cover a prescribed medication. For the drug Subsys (fentanyl), the Prior Authorization process for Medicare patients is set up to determine if the patient has breakthrough cancer pain, which is the only indication for which Medicare would pay for the drug. J.M.'s Prescription Drug Plan (PDP), Express Scripts, provided the affiant with the documentation and statements that business collected in order to determine coverage for the use of Subsys (fentanyl) by J.M. On September 24, 2014, a Prior Authorization was called in to Express Scripts by an unknown individual. The diagnosis code give to justify the Subsys was "338.4: Chronic Pain Syndrome." However, in the comments provided with the diagnosis, the prior approval records state "Breakthrough pain in cancer patients. Treating breakthrough pain with the 338.4." Discussing "cancer" in a prior authorization when the patient does not actually have cancer is a material false statement that influences the Medicare payment decision for these drugs. As stated previously, Medicare does not pay for the off-label usage of Subsys (fentanyl). The only on-label usage of Subsys is to treat breakthrough cancer pain. As of July 2017, Medicare has paid over $970,000 for Subsys for J.M. This warrant seeks to obtain evidence regarding J.M. as discussed in further detail in the attachment.

**T. Medicare Contractor Referral to HHS-OIG**

110.    On April 15, 2016, a contractor for the Medicare program sent a referral package to HHS/OIG suggesting that HHS/OIG investigate Dr. DEAN. The letter stated "Dr. DEAN is suspected of providing false cancer diagnoses on official documents for patients to whom he is prescribing Subsys." The letter further states that "No diagnosis code for cancer could be located in the Part A or Part B records for nine beneficiaries. Prior authorization records were obtained from the PDPs for Medicare beneficiaries J.M., W.Z., J.D., and J.H. The prior authorization records indicated that the beneficiaries had cancer-related illnesses. These beneficiaries were listed in the analysis as not having cancer-related diagnosis codes in their Part A or Part B records." This warrant seeks to obtain evidence regarding J.M, J.D., T.C., P.P., C.J., L.S., M.J., M.G., and W.Z. as discussed in further detail in the attachment.

29

**U. Patient and Employee R.B.**

111.    On January 26, 2017, DEA investigators interviewed R.B., a former employee and patient of Dr. DEAN.  R.B. became employed by Dr. DEAN in September 2015 and worked for him until December 2015, when she quit because Dr. DEAN's office was only open two days a week and she needed something full time.  Bank records show Dr. DEAN wrote checks to R.B. from November 16, 2015 – January 28, 2016 for "office work", totaling approximately $1,500.  R.B. stated in addition to an employee, she was Dr. DEAN's patient from October 2015 – December 2015.  R.B. stated that her previous doctor in Alabama had her on 30 mg Oxycodone 3 times a day and that Dr. DEAN increased it to four times a day.  After the first month, Dr. DEAN began prescribing her 10 mcg Fentanyl patches, along with Oxycodone. R.B. stated that she stopped taking the Oxycodone and Fentanyl together herself because the combination of the two made her too "loopy."  Dr. DEAN also prescribed R.B. Adderall (Amphetamine), and Baclofen (Muscle Relaxant).  R.B. also stated that Dr. DEAN tried to prescribe her Subsys (Fentanyl), but she told him she didn't want that drug.  R.B. recalled that Dr. DEAN had something set up with OLIVE STREET Pharmacy, so his patients got their prescriptions filled there.  R.B. stated that not only was R.W. an employee of Dr. DEAN, they were romantically involved, R.W. was living with Dr. DEAN, and Dr. DEAN was helping R.W. with the expenses associated with her DWI charges.

112.    An analysis of R.B.'s pharmacy records from OLIVE STREET and WALGREENS confirmed R.B.'s recollection of the medications prescribed by Dr. DEAN:

| Date Filled | Controlled Substance | Quantity | Pharmacy |
|---|---|---|---|
| 12/7/2015 | Oxycodone HCL 30 Mg | 90 | OLIVE STREET |
| 12/7/2015 | Amphetamine Salts 30 Mg | 60 | OLIVE STREET |
| 12/7/2015 | Fentanyl Patch 75 mcg | 10 | OLIVE STREET |
| 12/14/2015 | Fentanyl Patch 50 mcg | 10 | OLIVE STREET |
| 12/29/2015 | Fentanyl Patch 50 mcg | 10 | OLIVE STREET |
| 12/29/2015 | Oxycodone HCL 30 Mg | 90 | OLIVE STREET |
| 12/29/2015 | Amphetamine Salts 30 Mg | 60 | OLIVE STREET |
| 1/28/2016 | Amphetamine Salts 30 Mg | | WALGREENS |

| 1/28/2016 | Oxycodone 30 Mg | | WALGREENS |
| 2/17/2016 | Amphetamine Salts 30 Mg | 20 | OLIVE STREET |
| 2/17/2016 | Oxycodone HCL 30 Mg | 20 | OLIVE STREET |

113.    This warrant seeks to obtain evidence regarding R.B. as discussed in further detail in the attachment.


**V. Suspected Quid Pro Quo Relationships with Patients**


114.    As previously discussed in paragraph 43 and paragraphs 102, Dr. DEAN lived with at least two patients, R.W. and L.R., and as described in paragraph 51, R.W. suspected R.H. had a very close relationship with Dr. DEAN.  This warrant seeks to obtain evidence regarding these two individuals, as discussed in further detail in the attachment.


115.    As previously discussed in paragraph 67, Joe ROSICK spoke to investigators on April 25, 2017.  ROSICK stated during this interview that he thought there were patients that had a "quid pro quo" relationship with Dr. DEAN, such as T.S. and R.D.  ROSICK believed that T.S. did mechanic work for Dr. DEAN in exchange for prescriptions, and R.D. rented one of Dr. DEAN's houses.  According to Medicare claims data, R.D. was prescribed the "Trinity" by Dr. DEAN.  According to Medicare claims data, T.S. was prescribed both narcotics and central muscle relaxants by Dr. DEAN.  This warrant seeks to obtain evidence regarding T.S. and R.D., as explained in further detail in the attachment.


116.    On February 3, 2017, DEA investigators interviewed T.K., a patient and former employee of Dr. DEAN who was incarcerated for numerous offenses.  T.K. stated that he had been a patient of Dr. DEAN's since sometime in the 1990's.  Dr. DEAN has been prescribing him 120 Hydrocodone 10 mg tablets, among other medications.  Before being incarcerated, T.K. was taking between 4-6 hydrocodone tablets a day.  T.K. stated he has also worked for Dr. DEAN, answering telephones and taking patient's blood pressure. T.K. had training as a medical technician while in prison in 2000.  T.K. said Dr. DEAN never paid him for the work he did in the office.  Grand jury bank records show that T.K. was paid $100 on June 6, 2015 by Dr. DEAN

31

for "office work", and $499 on March 3, 2016 for "office work 2015."  Medicaid prescription records confirm that Dr. DEAN prescribed T.K. Hydrocodone, but also that Dr. DEAN prescribed T.K. 75 and 100 mcg Fentanyl patches.  This warrant seeks to obtain evidence regarding T.K., as explained in further detail in the attachment.

## W. Patients with Criminal Convictions for Controlled Substance Possession and Prescriptions from Dr. DEAN

117.    As discussed in paragraph 22, controlled substance prescriptions must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  In my training and experience, individuals who have been previously convicted of illegally possessing or distributing a controlled substance often seek prescription drugs for non-legitimate purposes, including diversion or intoxication.  An analysis of Medicaid beneficiaries with criminal histories shows that 5 of Dr. DEAN's patients had convictions for controlled substance-related offenses prior to obtaining a controlled substance prescription paid for by Medicaid from Dr. DEAN.

| Patient Name | Conviction | Date | Prescription Months | Schedule 2 Controlled Substance Prescription(s) |
|---|---|---|---|---|
| M.B. | Possession of a Controlled Substance – Felony | 5/28/2014 | September 2015 – September 2016 | Fentanyl and Hydrocodone |
| K.C. | Possession of a Controlled Substance – Felony | 8/7/2012 | April 2013 – July 2013 | Hydrocodone |
| L.H. | Possession of a Controlled Substance | 1/25/2012 | December 2013 – April 2014 | Hydrocodone |

| R.J. | Possession of a Controlled Substance | 4/23/2013 | May 2014 – October 2014 | Oxycodone, Hydrocodone, Subsys (Fentanyl) |
| R.W. | Possession of a Controlled Substance – Felony | 6/28/2013 | December 2010 – March 2016 | Oxycodone, Oxymorphone, Hydrocodone, Tapentadol, Subsys (Fentanyl) |

118.    This warrant seeks to obtain evidence regarding these five patients, as identified in Attachment C.

## X. Facebook Messages Regarding Living in Dr. DEAN's House

119.    On June 15, 2017, the Court authorized a search warrant for Dr. DEAN's Facebook account.  Facebook provided records in response to the warrant, which were analyzed by your affiant.  Between January 2017 and February 2017, Dr. DEAN communicated on Facebook with a woman named S.T.  S.T. asks Dr. DEAN if there is anything he can do to help her stay on disability Medicare.  A couple weeks later, Dr. DEAN says "You could come here, live in your bedroom…screamer and cheer at tv all day, then you help with pts, some??"  S.T. responds, "I don't cook so that's good. Bring left overs back for later.  I have so much baggage? Meds…etc…?"  Dr, DEAN responds, "Other gals in that room never cooked either…meds we do."  This warrant seeks to obtain evidence regarding S.T., as discussed in the attachment.

120.    Between October 2016 and February 2017, Dr. DEAN communicated on Facebook with a woman named C.H.  Dr. DEAN's first message to C.H. says, "Hey there, voice from the past…You look the same…You need to work in my office as counselor, or maybe I move to ks soon? Dr. phil dean."   At the end of December, C.H. messaged, "I'd enjoy seeing you but have to take care of my health issues."  Dr. DEAN responded, "I am great catch…Your savior…" C.H. responded back, "Just need to take care of a few things…I am as close to homelessness as I've ever been, and all because of health issues.  After MRI Jan 4, will know more about my

situation." A week later, C.H. complained to Dr. DEAN about not being able to pick up her prescriptions. Dr. DEAN responded "Drive to columbia, we meet and write scripts ya need???"

121.     In the Facebook records, at first C.H. discussed coming to meet Dr. DEAN in Columbia. C.H. also sent the results of her MRI to Dr. DEAN. At the end of January, C.H. messaged to Dr. DEAN to suggest that she start living with him, "I have to go to Walmart on your Nicole this afternoon. I need a few things. You can take it out of trade!!! LOL." Dr. DEAN responds, "Trade what??? Whaddya got??" C.H. responds "No underwear…Can you work w/ that???" A few days later, C.H. messaged Dr. DEAN, "doc I will never forgive you TV stuck on fox 4…are you w-mom? Tell her to get ready, jail break about to happen!! Also having pain, PAIN!!!" C.H. then messaged "Dean call before you come home…a large corona, I have the money." Dr. DEAN responds, "Show me the money…Lol…Drone delivery since I left??? Or stolen quarters again…lol." C.H. responded "Damn you what are you reading my posts!!!" Dr. DEAN responded "Nope." C.H. said "Definitely stolen quarters!?!! Geez K cpilf be hitting you up for meds!!! LOL", to which Dr. DEAN responded "[R.W.] never did…Rinse, repeat…Lol." The next day C.H. messaged "My stomach hurts…", to which Dr. DEAN responded "Help is on the way…" The last message recorded by Facebook is a week and a half later from C.H. to Dr. DEAN, "Really angry, afraid, and in pain!"

122.     There is then a nearly four month gap in mentions of C.H. in Dr. DEAN's Facebook records. It is unclear if C.H. is living with Dr. DEAN during this time. The only other mention of C.H. on Dr. DEAN's Facebook page is when he comments on a post on May 5, 2017 and says, "Molly, can you room C.H. two nites, she is moving Monday.. I can pay ya, she can babysit.. She is honest paralegal type. Has two teens in Arizona.. Call me…" This warrant seeks to obtain evidence regarding C.H., as detailed in the attachment.

**Y. Location of Medical Records**

123.     As previously discussed in paragraph 12, Dr. DEAN reported to Medicare that medical records are stored at the clinic, 509 E Booneslick Rd, Warrenton, MO. Additionally, as discussed in paragraph 95, Medicaid reviewed medical records at the clinic, where Dr. DEAN

reported they were kept upstairs in the clinic.  Therefore, there is probable cause to believe that the evidence needed is present at this location.

124.    Numerous patients and employees have told us that Dr. DEAN's clinic in Warrenton is only open Mondays and Thursdays, from 9:00 am until 4:00 pm.  The plan is to execute on a day when there are no patients present, such as a Wednesday morning.  Agents will work with Dr. DEAN once the records are seized to determine which patients have upcoming appointments. These patient records will be prioritized for copying and scanning and returning to Dr. DEAN so as to not interrupt patient care.  A subpoena will also be served on Dr. DEAN to cover any records not immediately obtained during the search.  The copy of the search warrant (if authorized) that will be left at the clinic will use the patient's full names, not initials, on the attachments, along with their dates of birth, but will not include the other 4 columns shown on the attachment to this affidavit.

## Z. Computers As Instruments of Criminal Offenses

125.    Affiant has reason to believe that Dr. DEAN utilizes computers in the regular course of his business operation, and that computers located within the business premises at Dr. DEAN's office likely contain information related to the potential violations of law referenced herein.

126.    Medicaid provider enrollment records were reviewed. The Affiant confirmed that pdeanmd@centurytel.net  was Dr. DEAN's contact e-mail address.

127.    Affiant has reviewed Medicare provider enrollment records for Dr. DEAN.  Medicare provider enrollment records dated October 28, 2011, and January 5, 2012 listed Dr. DEAN as the Contact Person who utilized pdeanmd@centurytel.net as an e-mail address.

128.    Medical records provided to Medicaid during an audit show typewritten pages of patient notes that appear to have been produced using a word processor.

129.    In August 2016, Dr. DEAN had an active website: www.pdeanmd.com.

35

## **Considerations Regarding Computer Equipment**

130.    As detailed above, there is probable cause to believe that evidence of the commission of the criminal offenses described herein will be contained in computer equipment, including at least one computer, located at the premises to be searched. As previously noted, there is reason to believe that Dr. DEAN types up patient notes prior to placing them in the medical record.

131.    Affiant knows that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (a) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (b) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of the crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime.

132.    HHS/OIG employs personnel with specialized knowledge, training, and experience relating to computer and digital evidence (hereafter, "computer forensic personnel"). Based on my knowledge, training and experience, and the knowledge, training and experience of other agents and investigators with expertise in computer and electronic/digital evidence, Affiant is aware of the following:

   a.   Hardware - Computer hardware includes all computer equipment capable of being linked together in a local area network (LAN) (to include any equipment which has remote access capabilities) including all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters,

36

video display monitors, and optical readers); and related communication devices (such as modems, cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b. Software - Computer software is digital information which can be interpreted by a computer and any related components to direct the way they work. Software is stored in electronic, magnetic, optical, or digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interprets, and communications programs.

c. Documentation - Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. Passwords and Data Security - Computer passwords and other data security devices are designated to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming codes. Data security hardware may include encryption devices, chips, or circuit boards. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

e. Computer hardware and computer software may be utilized to store information or data in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer related equipment. Such media includes, for example, fixed hard drives and removable hard drive cartridges and cards, laser disks, tapes, floppy disks, memory sticks, CD ROMs, DVDs, and any other media capable of storing magnetic coding.

37

f.  Addresses:  Every device on the Internet has an address that allows other devices to
    locate and communicate with it. An Internet Protocol ("IP") address is a unique number
    that identifies a device on the Internet. An IP address looks like a series of four numbers,
    each in the range 0-255, separated by periods (e.g., 121.56.97.178). Most Internet service
    providers ("ISPs") control a range of IP addresses. When an ISP or other provider uses
    dynamic IP addresses, the ISP assigns one of the available IP addresses in the range of IP
    addresses controlled by the ISP each time a user dials into the ISP to connect to the
    Internet. The customer's computer retains that IP address for the duration of that session
    (i.e., until the user disconnects), and the IP address cannot be assigned to another user
    during that period. Once the user disconnects, however, that IP address becomes
    available to other customers who connect at a later time. Thus, an individual customer's
    IP address normally differs each time he dials into the ISP. A static IP address is an IP
    address that is assigned permanently to a given user or computer on a network. A
    customer of an ISP that assigns static IP addresses will have the same IP address every
    time. Other addresses include Uniform Resource Locator (URL) addresses, such as
    "http://www.usdoj.gov," which are typically used to access web sites or other services on
    remote devices. Domain names, host names, and machine addresses are other types of
    addresses associated with Internet use.

g.  Log files are computer files that contain records about system events and status, the
    identity and activities of users, and anomalous or unauthorized computer usage. Names
    for various log files include, but are not limited to: user logs, access logs, audit logs,
    transactional logs, and apache logs. Logs can also maintain records regarding the
    identification of users on a network, as well as Internet sites accessed by the computer.

h.  Electronic mail ("e-mail") is a popular form of transmitting messages and/or files in an
    electronic environment between computer users. When an individual computer user sends
    e-mail, it is typically initiated at the user's computer, transmitted to a mail server, and
    then transmitted to its final destination. A server is a computer that is attached to a
    dedicated network and serves many users. An e-mail server may allow users to post and

38

read messages and to communicate via electronic means.

133.     Based upon my training and experience and information related to me by Agents and others involved in the forensic examination of computers, Affiant knows that computer data can be stored in a variety of systems and storage devices including hard drives, floppy disks, compact disks, magnetic tapes, and memory chips.  Affiant also knows that during a search of a business, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.  Volume of evidence:  Computer storage devices (like hard disks, diskettes, tapes, CDs, DVDs, and thumb drives) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime. This sorting process can take weeks or months, depending on the volume of data stored, and it may be impractical to attempt this kind of data search on site.

b.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources, or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

c.  Computer files or remnants of such files can be recovered months, even years, after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic

39

files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set of block storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

d. Searching computer equipment for evidence described can require a range of computer forensic analysis techniques. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. Data analysis may use several different techniques to search electronic data for evidence or instrumentalities of a crime. These include, but are not limited to the following: examining file directories and subdirectories for the lists of files they contain, "opening" or reading the first few "pages" of selected files to determine their contents, scanning for deleted or hidden data, searching for key words or phrases ("string searches").

e. Accordingly, Affiant requests permission to seize the computer hardware, and associated peripherals, which are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site analysis of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be

40

impractical to search the computer hardware on-site for this evidence. HHS/OIG's computer forensic personnel will attempt to make duplicate images of the computer storage equipment at Dr. DEAN's office, precluding the need to seize the equipment. In the event that this is not possible, or will require extensive time on site, Agents will seize the equipment, computer forensic personnel will image the storage equipment at HHS/OIG's Kansas City Field Office, and Agents will return the equipment to Dr. DEAN within fourteen (14) days of any search.

## Confidentiality of Seized Records

134.    Because some of the documents to be seized contain protected health information, Affiant will put into place the following procedures. The records will be stored in a locked room and only persons involved in the investigation will be given access to the protected health information. It is anticipated that law enforcement agents and investigators, government attorneys, and government experts will be given access to the records.

## Access to Seized Records

135.    Dr. DEAN may contact Affiant at (816) 426-4013 to request access to the seized documents and to have all or some of the documents copied at their expense if any of the records are needed for ongoing health care treatment of patients/consumers.

## Conclusion

136.    Based on the foregoing, there is probable cause to believe that Dr. DEAN distributed controlled substances prescriptions to patients without a legitimate medical purpose outside of the usual course of his professional practice.   Further, there is probable cause to believe that Dr. DEAN caused the submission of false and fraudulent claims for medically unnecessary and non-covered prescription drugs, including Subsys (fentanyl) for patients with no cancer diagnosis, to health care benefit programs, including Medicare and Medicaid.  There is also probable cause to believe the evidence, fruits, and instrumentalities of the crimes set forth herein may be located inside Dr. DEAN's clinic (511 E Booneslick Rd, Warrenton, MO).


8/2/2017
DATE

Teresa A. Dailey
Special Agent
U.S. Department of Health & Human Services, Office of Inspector General (HHS/OIG)


SUBSCRIBED and SWORN to before me this 2nd day of August, 2017.

NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

42

## <u>ATTACHMENT A</u>

Front of the clinic at 511 E Booneslick Rd, Warrenton, MO





Rear of the clinic



## ATTACHMENT B

### Items and Documents to be Seized

For the time period for violations occurring during August 31, 2009 through the date of the execution of any warrant, any and all evidence, fruits, and instrumentalities relating to or involving health care fraud, false statements related to health care matters, and distribution of controlled substances by a physician acting outside the usual course of medical practice (Title 18 U.S.C. § 1347, § 1035, and Title 21, U.S.C. § 841(a)(1)).including but not limited to the following specific items:

1.      Patient files for the list of patients shown below. For the purposes of this Affidavit, "patient files" means any evidence that refers or relates to a patient's care or medical treatment, including but not limited to TIRF REMS enrollment forms, "History and Physical" notes, "brief pain inventory" notes, "Beck Depression Inventory" forms, "Neurological Examination" forms, medication lists assessments, plans of care, care plan supplements, case notes, history and physicals, discharge summaries, operative records, treatment summaries, progress notes, nursing notes, prescriptions, drug orders, admission forms, intake forms, referral documents, emergency visit forms, physician's orders, discharge forms, autopsy or coroner's reports, laboratory or diagnostic tests and results, treatment histories, x-rays, any correspondence or contact with the patient about Dr. DEAN's care and billing for the patient, and/or any other documents related to a patient's treatment and receipt of health care services.

2.      Patient billing records for the list of patients shown below. For the purposes of this Affidavit, "billing records" means any evidence that relates to any billing, claims, requests or demands for payment from the any health care benefit program or insurance company for any health care services, including but not limited to claim forms, superbills, remittance advices, exception, recoupment or adjustment correspondence, billing summaries, account details, checks, health care program correspondence, provider agreements, or other related documents.

3.      Appointment calendars, personal calendars, travel records, activity reports or any other document showing patient appointment/schedules, daily activities/travel, or the schedules for independent contractors and Dr. DEAN.

45

4.      Any prescriptions that are blank, incomplete, altered, pre-signed, pre-dated, post-dated and/or containing original or copied signatures suspicious in nature.

5.      Any supporting documentation associated with the prescriptions listed in paragraph 1.

6.      Patient sign-in and/or sign-out sheets.

7.      Any records of cash payment by Dr. Dean or patients for drugs or medical services, including cash ledgers.

8.      Records reflecting communication between Dr. DEAN or a representative and any patient, family member and/or legal guardian of the patient, including any documents about complaints about treatment, medical services, or billing issues, including but not limited to call-logs, letters, complaints, and notices of payments, rejections, denials and credit adjustments.

9.      Personnel records for present and former employees and independent contractors of Dr. DEAN, including employment applications, resumes, transcripts, degrees, licenses, certifications, payment records, and documents reflecting communication with Dr. DEAN.

10.     Records reflecting communication between Dr. DEAN and any agency or representative of the federal government or the state of Missouri, including any documents about complaints about treatment, medical services, or billing issues, including but not limited to letters, complaints, and notices of payments, rejections, denials and credit adjustments.

11.     E-mail or other correspondence from or to Dr. DEAN and employees or independent contractors concerning their employment by Dr. DEAN, drug prescription and dispensation procedures by employees or independent contractors and/or complaints about patients.

12.     Any medications that contain controlled substances, in pill, patch, spray or other formats, that are kept by Dr. DEAN or have been returned by patients to Dr. DEAN, including Vicodin, Subsys (fentanyl), and Oxycontin.

13.     Any records regarding the issues discussed above in paragraphs 1-12 of this attachment
that can be found on any computers inside the office of Dr. DEAN (and any related storage
media), and:

      a.     For any computer or storage medium whose seizure is otherwise authorized by
this warrant, and any computer or storage medium that contains or in which is
stored records or information that is otherwise called for by this warrant
(hereinafter, "COMPUTER"):

      b.     evidence of who used, owned, or controlled the COMPUTER at the time the
things described in this warrant were created, edited, or deleted, such as logs,
registry entries, configuration files, saved usernames and passwords, documents,
browsing history, user profiles, email, email contacts, "chat," instant messaging
logs, photographs, and correspondence;

      c.     evidence of the attachment to the COMPUTER of other storage devices or similar
containers for electronic evidence;

      d.     evidence of counter-forensic programs (and associated data) that are designed to
eliminate data from the COMPUTER;

      e.     evidence of the times the COMPUTER was used;

      f.     passwords, encryption keys, and other access devices that may be necessary to
access the COMPUTER;

      g.     contextual information necessary to understand the evidence described in this
attachment.

## ATTACHMENT C

### Patient files to be Seized

| Number | Patient Name | DOB | Overdose | Subsys | Quid Pro Quo | Criminal History/Fired by Dean |
|---|---|---|---|---|---|---|
| 1 | R.W. | | | X | X | X |
| 2 | E.W. | Father of R.W. (Obtaining under false pretenses) | | | | |
| 3 | L.R. | | | | X | |
| 4 | M.R. | | | | | X |
| 5 | W.R. | | | | | X |
| 6 | M.S. | | X | | | |
| 7 | K.K. | | X | X | | |
| 8 | M.M. | | X | X | | |
| 9 | J.M. | | | X | | |
| 10 | J.D. | | | X | | |
| 11 | T.C. | | | X | | |
| 12 | P.P. | | | X | | |
| 13 | C.J. | | | X | | |
| 14 | L.S. | | | X | | |
| 15 | M.J. | | | X | | |
| 16 | M.G. | | | X | | |
| 17 | W.Z. | | | X | | |
| 18 | R.B. | | | | X | |
| 19 | R.H. | | | | X | |
| 20 | T.S. | | | | X | |
| 21 | R.D. | | | | X | |
| 22 | T.K. | | | | X | |
| 23 | M.B. | | | | | X |
| 24 | K.C. | | | | | X |
| 25 | L.H. | | | | | X |
| 26 | R.J. | | | | | X |
| 27 | S.T. | | Facebook | | | |
| 28 | C.H. | | Facebook | | | |

48